NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

———————————

**DIAMOND SAWBLADES MANUFACTURERS COALITION,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

**BEIJING GANG YAN DIAMOND PRODUCTS COMPANY, GANG YAN DIAMOND PRODUCTS, INC.,**
*Defendants-Cross-Appellants*

**CLIFF INTERNATIONAL, LTD.,**
*Defendant*

**HUSQVARNA CONSTRUCTION PRODUCTS NORTH AMERICA, INC., HEBEI HUSQVARNA-JIKAI DIAMOND TOOLS CO., LTD., WEIHAI XIANGGUANG MECHANICAL INDUSTRIAL CO., LTD., BOSUN TOOLS CO., LTD., BOSUN TOOLS, INC.,**
*Defendants-Appellees*

———————————

2016-1254, 2016-1255

———————————

Appeals from the United States Court of International Trade in No. 1:13-cv-00241-RKM, Senior Judge R. Kenton Musgrave.

—————————

Decided:  August 7, 2017

—————————

DANIEL B. PICKARD, Wiley Rein, LLP, Washington, DC, argued for plaintiff-appellant. Also represented by USHA NEELAKANTAN, MAUREEN E. THORSON.

JOHN JACOB TODOR, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by BENJAMIN C. MIZER, JEANNE E. DAVIDSON, FRANKLIN E. WHITE, JR.; AMANDA T. LEE, Office of Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, Washington, DC.

JEFFREY S. NEELEY, Husch Blackwell LLP, Washington, DC, argued for defendants-cross-appellants. Also represented by MICHAEL SCOTT HOLTON.

THOMAS M. BELINE, Cassidy Levy Kent (USA) LLP, Washington, DC, argued for defendants-appellees Husqvarna Construction Products North America, Inc., Hebei Husqvarna-Jikai Diamond Tools Co., Ltd. Also represented by JENNIFER HILLMAN.

MAX FRED SCHUTZMAN, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, New York, NY, argued for defendant-appellee Weihai Xiangguang Mechanical Industrial Co., Ltd. Also represented by BRUCE M. MITCHELL; DHARMENDRA NARAIN CHOUDHARY, KAVITA MOHAN, Washington, DC; ANDREW SCHROTH, Hong Kong, China.

GREGORY S. MENEGAZ, DeKieffer & Horgan, PLLC, Washington, DC, argued for defendants-appellees Bosun Tools Co., Ltd., Bosun Tools, Inc. Also represented by JAMES KEVIN HORGAN, ALEXANDRA H. SALZMAN.

DANIEL L. PORTER, Curtis, Mallet-Prevost, Colt & Mosle LLP, Washington, DC, for amici curiae Shanghai Huayi Group Corporation Limited, China Manufacturers Alliance. Also represented by JAMES P. DURLING, CLAUDIA DENISE HARTLEBEN; GENE C. SCHAERR, Schaerr Duncan, Washington, DC.

WILLIAM ALFRED FENNELL, Stewart & Stewart, Washington, DC, for amici curiae Titan Tire Corporation, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC. Also represented by NICHOLAS J. BIRCH, LANE S. HUREWITZ, TERENCE PATRICK STEWART.

---

Before LOURIE, O'MALLEY, and TARANTO, *Circuit Judges.*

O'MALLEY, Circuit Judge.

Diamond Sawblades Manufacturers Coalition ("DSMC") appeals from a decision of the Court of International Trade ("CIT") upholding the Department of Commerce's ("Commerce") determination that a targeted dumping allegation made by DSMC was untimely. *See Diamond Sawblades Mfrs. Coalition v. United States* (*CIT Decision*), 2015 Ct. Int'l Trade LEXIS 116 (Ct. Int'l Trade Oct. 21, 2015).[1] Commerce concluded that DSMC's alle-

---

[1] Targeted dumping involves situations in which sales of comparable merchandise exhibit a pattern of export prices that "differ significantly among purchasers, regions, or periods of time."    19 U.S.C. § 1677f-

gation was untimely because it was filed after Commerce issued its preliminary results in the second administrative review of the antidumping duty order for diamond sawblades and parts thereof from the People's Republic of China ("PRC"). *See Diamond Sawblades and Parts Thereof from the People's Republic of China: Final Results of Antidumping Duty Admin. Review: 2010-2011 (Final Results)*, 78 Fed. Reg. 36,166 (Dep't of Commerce June 17, 2013); *Diamond Sawblades and Parts Thereof from the People's Republic of China: Amended Final Results of Antidumping Duty Admin. Review (Amended Final Results)*, 78 Fed. Reg. 42,930 (Dep't of Commerce July 18, 2013).

Advanced Technology & Materials entity ("ATM"), comprised of Beijing Gang Yan Diamond Products Company, Gang Yan Diamond Products, Inc., and other affiliated companies, cross-appeals to challenge the CIT's decision affirming Commerce's determination to apply the PRC-wide entity rate to ATM in this administrative review. *See CIT Decision*, 2015 Ct. Int'l Trade LEXIS 116, at *4–5; *Diamond Sawblades Mfrs. Coalition v. United States (Final Remand Redetermination)*, Court No. 13-00241, slip op. 14-112 (Dep't of Commerce May 18, 2015), http://enforcement.trade.gov/remands/14-112.pdf.

ATM's cross-appeal is related to an appeal in *Diamond Sawblades Manufacturers Coalition v. United States (Diamond Sawblades I)*, Case No. 2016-1253, also decided today. Both opinions involve administrative reviews of the antidumping duty order Commerce issued after its initial investigation into the potential dumping of diamond sawblades and parts thereof from the People's Republic of China ("PRC"). This opinion addresses Commerce's second administrative review of the antidumping

---

1(d)(1)(B)(i); *see also U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1359 (Fed. Cir. 2010).

duty rate, covering the period 2010–2011, and the companion opinion in *Diamond Sawblades I* addresses the first administrative review, covering the period 2009–2010. Because the facts and procedural history in the two cases are closely related, we will not repeat here our discussion of those issues, except to the extent the facts and procedural history relevant to this administrative review extend beyond what we cover in *Diamond Sawblades I*.

Because Commerce erred in rejecting DSMC's targeted dumping allegation as untimely, we *vacate* the CIT's decision on that question and *remand* for further proceedings regarding those allegations. Because we vacate Commerce's decision on the targeted dumping allegation, we also *vacate* the CIT's decision affirming Commerce's determination of the margin for the non-selected separate rate respondents and *remand* for further proceedings in conjunction with the consideration of the targeted dumping allegations. For the reasons explained in our opinion in *Diamond Sawblades I*, we *affirm* the CIT's decision upholding Commerce's final remand redetermination applying the recalculated PRC-wide entity rate to ATM.

## I. Background

### A. DSMC's Targeted Dumping Allegation

Commerce conducted a second administrative review, covering the period from November 1, 2010 through October 31, 2011, of an antidumping duty order previously imposed on imports of diamond sawblades from the PRC. Commerce issued the preliminary results of the second administrative review of the antidumping duty order with an effective date of December 10, 2012. *See Diamond Sawblades and Parts Thereof from the People's Republic of China: Preliminary Results of Antidumping Duty Admin. Review: 2010-2011* (*Preliminary Results*), 77 Fed. Reg. 73,417 (Dep't of Commerce Dec. 10, 2012). Before the preliminary results, DSMC had not made any

allegations in the proceedings regarding targeted dumping.

Pursuant to 19 C.F.R. § 351.309, Commerce permits interested parties to file case briefs commenting on the preliminary results. On February 19, 2013, 71 days after the effective date of the preliminary results, DSMC filed its case brief. *See CIT Decision*, 2015 Ct. Int'l Trade LEXIS 116, at *12. In its case brief, DSMC asked Commerce to initiate a targeted dumping inquiry regarding sales of Weihai Xiangguang Mechanical Industrial Co. ("Weihai"). On February 25, 2013, Weihai presented comments and arguments in opposition to DSMC's allegations, as authorized by 19 C.F.R. § 351.309.

On June 17, 2013, Commerce issued the final results of the second administrative review. *See Final Results*, 78 Fed. Reg. at 36,166–68. In the Issues and Decisions Memorandum accompanying the final results, Commerce found DSMC's targeted dumping allegation untimely and refused to consider it on the merits. In the Memorandum, Commerce acknowledged that it "has not established specific deadlines for when the Department will accept targeted dumping allegations in administrative reviews." J.A. 101. But Commerce found that DSMC had "ample opportunity to have filed its targeted dumping allegation prior to December 3, 2012, and certainly prior to its case brief" given the "elapsed time between the issuance of the respondent's questionnaire responses and the issuance of the *Preliminary Results*." *Id.*

Commerce also explained that the timing of DSMC's targeted dumping allegation did not provide sufficient time for Commerce to complete its analysis while giving interested parties an opportunity to comment on the analysis. *Id.* Commerce pointed to an administrative review in another case in which the petitioner had submitted its targeted dumping allegation prior to the issuance of the preliminary results, which gave Commerce

time to analyze the allegation, issue a post-preliminary analysis for comment, and complete the analysis before issuing its final results. *Id.* Commerce stated that DSMC's timing of its targeted dumping allegation "did not provide Weihai or other interested parties with sufficient time to adequately review and comment on such an allegation" and "raise[d] due process concerns." *Id.*

DSMC appealed Commerce's finding of untimeliness. DSMC argued that Commerce had not established deadlines outside of the requirements of 19 C.F.R. § 351.309 for submitting a targeted dumping allegation. While the appeal to the CIT in this administrative review was pending, the CIT issued its decision in the investigation proceedings, finding that ATM did not qualify for a separate rate because it failed to rebut Commerce's presumption of government control applicable to non-market economy countries. *See* J.A. 12; *see also Advanced Tech. & Materials Co. v. United States*, 938 F. Supp. 2d 1342 (Ct. Int'l Trade 2013). Commerce requested a voluntary remand to reconsider its separate rate determination in this administrative review. J.A. 12. In its order remanding the case to Commerce, the CIT also requested that Commerce provide additional explanation as to its statutory authority to decline to consider targeted dumping issues. J.A. 16–17.

On remand, Commerce further explained its decision not to consider DSMC's targeted dumping allegation. *See Final Remand Redetermination*, slip op. 14-112, at 30–32. Commerce explained that, unlike for initial investigations, the relevant statutes did not mandate the consideration of an alternative comparison method in administrative reviews; instead, Commerce said it undertakes such a consideration as an agency practice, using 19 U.S.C. § 1677f-1(d)(1)(B) as guidance. *Id.* at 10–11, 30–32. Commerce also explained that it had "established the practice" of initiating a targeted dumping analysis when a party presented an allegation "at a reasonable time before

the preliminary determinations in investigations and preliminary results in reviews." *Id.* at 11; *see also id.* at 31–32.

The CIT affirmed Commerce's determination regarding the targeted dumping allegation. *See CIT Decision*, 2015 Ct. Int'l Trade LEXIS 116, at *6–14. It reasoned that Commerce correctly rejected DSMC's targeted dumping allegation because Commerce's "*Final Modification*" regarding the calculation of dumping margins noted that a new policy would apply to reviews in which "preliminary determinations" were not due for at least 60 days from the date of publication of the new policy, such as in this case. *Id.* at *11–12 (citing *Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification* (*Final Modification*), 77 Fed. Reg. 8101, 8101 (Dep't of Commerce Feb. 14, 2012)). The CIT also reasoned that, although "there were no established or articulated deadlines for the filing of targeted dumping allegations for administrative reviews, the DSMC were not, apparently, unaware of Commerce's apparent targeted dumping practice, in particular with respect to investigations, which requires an allegation thereof prior to the preliminary determination." *Id.* at *12. The CIT found Commerce's explanation that interested parties needed an opportunity to comment on the results of a targeted dumping analysis "not inherently unreasonable." *Id.* at *12–13.

### B. ATM Receives the PRC-Wide Entity Rate

During this second administrative review, Commerce initially found that ATM had demonstrated sufficient independence from state control to qualify for a separate rate. After Commerce rendered its decision, however, the CIT issued a decision in *Advanced Technology & Materials Co.*, affirming Commerce's determination in the initial investigation proceedings that ATM did *not* qualify for a

separate rate because it failed to rebut the presumption of state control. 938 F. Supp. 2d 1342, 1345–53 (Ct. Int'l Trade 2013).

Based on the decision in *Advanced Technology & Materials Co.*, Commerce asked for a voluntary remand to reconsider its analysis of ATM's rate in the second administrative review. On remand, Commerce determined that ATM was not entitled to a separate rate, but should instead receive the PRC-wide entity rate. Commerce also determined that the additional information it had received from ATM made it appropriate for Commerce to recalculate the PRC-wide entity rate to 82.05%, down from 164.09%.

On appeal to the CIT, ATM argued that Commerce's decision to use the PRC-wide entity rate was unreasonable. The CIT relied on the same reasoning it employed in the first administrative review and sustained the application of the PRC-wide entity rate to ATM.

## II. DISCUSSION

We apply the same standard of review used by the CIT in reviewing determinations made by Commerce. *AMS Assocs., Inc. v. United States*, 737 F.3d 1338, 1342 (Fed. Cir. 2013). We will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see also Dupont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005).

### A. Dumping Margins in Administrative Reviews

Commerce calculates a foreign exporter's dumping margin by comparing its export price to the normal value of the relevant merchandise. 19 U.S.C. § 1677(35)(A). When performing the comparison, Commerce can use one of three methods: average-to-average, transaction-to-transaction, or average-to-transaction. *See Union Steel v.*

*United States*, 713 F.3d 1101, 1103 (Fed. Cir. 2013). Since 1995, Commerce has defaulted to using the average-to-average or transaction-to-transaction methods in initial investigation proceedings, pursuant to 19 U.S.C. § 1677f-1(d)(1)(A). *Union Steel*, 713 F.3d at 1104. But 19 U.S.C. § 1677f-1(d)(1)(B) specifies an exception for those proceedings that allows Commerce to use the average-to-transaction methodology when analyzing targeted dumping. *Union Steel*, 713 F.3d at 1104 n.3.

Although the relevant statutory framework establishes which comparison method should be used in initial antidumping duty investigations, the statute does not specify which methodology Commerce should use in an administrative review. In 2012, Commerce published the *Final Modification*, stating that it would use the average-to-average method as the default method for annual administrative reviews. *Final Modification*, 77 Fed. Reg. at 8104, 8106–07. Although the average-to-average method became the default method, Commerce reserved the right to use an alternative comparison method on a case-by-case basis. *Id.* at 8104. Commerce indicated that the changes specified in the notice would go into effect for all ongoing reviews with at least 60 days remaining until the scheduled issuance of the preliminary results. *Id.* at 8111.

When Commerce published the notice regarding the default comparison method for annual administrative reviews, Commerce did not specify a deadline for a party to request that Commerce consider the use of an alternative comparison methodology, such as the average-to-transaction method, for targeted dumping. Commerce also did not issue any memoranda or notices providing a separate deadline for such requests.

During the pendency of this case,[2] Commerce did not have any regulations specifying the time period for making targeted dumping allegations in antidumping duty investigations or administrative reviews thereof. While parties once were required to make targeted dumping allegations at least 30 days before the preliminary determination in investigations, s*ee Withdrawal of the Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations* (*Targeted Dumping Regulation 2008*), 73 Fed. Reg. 74,930, 74,930 (Dep't of Commerce Dec. 10, 2008), Commerce withdrew that rule in 2008. *Id.* at 74,930–31. Commerce explained that it promulgated the rule at a time when it "had never performed a targeted dumping analysis," and, thus, had promulgated the regulation "without the benefit of any departmental experience on the issue of targeted dumping." *Id.* at 74,930. Commerce noted, however, that it had seen very few allegations or findings of targeted dumping by 2008, leading Commerce to question whether it had established an impractical deadline for submitting such allegations. *Id.* It determined that a "withdrawal of

---

[2]    As the government explains, Commerce changed its methodology in 2013 for determining whether an alternative comparison methodology is appropriate. *See Xantham Gum from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 78 Fed. Reg. 33,351, 33,352 (Dep't of Commerce June 4, 2013). Rather than employ a targeted dumping analysis, Commerce now uses a differential pricing analysis to determine whether an alternative comparison methodology is appropriate. Commerce also conducts a differential pricing analysis in every segment of a proceeding, thereby negating the need for a party such as DSMC to make a targeted dumping allegation before Commerce will consider whether to apply an alternative comparison methodology.

the provisions will provide the agency with an opportunity to analyze extensively the concept of targeted dumping and develop a meaningful practice in this area as it gains experience in evaluating such allegations." *Id.* at 74,930–31.  It also clarified that Commerce was "not replacing these provisions with new provisions" but instead "returning to a case-by-case adjudication, until additional experience allows the Department to gain a greater understanding of the issue." *Id.* at 74,931.

After 2008, Commerce specified when targeted dumping allegations were due in some initial investigations, but did not establish a policy applying to all investigations and reviews.  No deadlines were ever specified in this case, and Commerce points to no rule or order which DSMC allegedly violated.

### B. Timeliness of DSMC's Targeted Dumping Allegation

DSMC argues that the CIT erred in sustaining Commerce's decision rejecting DSMC's targeted dumping allegation as untimely.  DSMC asserts that, because it had no notice of a deadline for filing a targeted dumping allegation, it properly filed its allegation in its case brief, which, in accordance with 19 C.F.R. § 351.309, must present all arguments that a party believes are relevant to Commerce's final determination.  Because its case brief complied with 19 C.F.R. § 351.309 and included the targeted dumping allegation, DSMC argues that Commerce's decision to reject the targeted dumping allegation as untimely was unsupported by substantial evidence and contrary to law.  We agree.

The parties dispute whether Commerce had established a regular practice of requiring the submission of targeted dumping allegations prior to the issuance of preliminary results on three grounds.  First, the parties dispute whether the *Final Modification*, explaining that the new policy outlined there would become effective for reviews in which the preliminary results would issue at

least 60 days after the policy's publication, directed parties to submit targeted dumping allegations sufficiently in advance of the preliminary results. Second, the parties dispute whether Commerce's decisions in previous administrative reviews, particularly *Purified Carboxymethylcellulose From Finland; Notice of Preliminary Results of Antidumping Duty Administrative Review*, 77 Fed. Reg. 47,036 (Dep't of Commerce Aug. 7, 2012), and *Circular Welded Carbon Steel Pipes from Turkey: Final Results of Antidumping Duty Administrative Review*, 77 Fed. Reg. 72,818 (Dep't of Commerce Dec. 6, 2012), put parties on notice of an obligation to submit targeted dumping allegations prior to Commerce's preliminary results. And third, the parties dispute whether Commerce's regular practice in initial antidumping investigations constituted notice that Commerce required parties to submit targeted dumping allegations in administrative reviews before Commerce issued its preliminary results.

As explained in more detail below, we agree with DSMC that none of the actions to which Appellees point in support of the decision in this case established a requirement that targeted dumping allegations be made prior to Commerce's preliminary results. As DSMC contends, Commerce and the CIT pointed to "no single regulation, *Federal Register* notice, prior precedent or other communication made to the bar in general or the DSMC in particular that provides actual or constructive notice of any deadline for filing targeted dumping allegations in administrative reviews, much less a pre-preliminary deadline." Appellant's Resp./Reply Br. 43. Indeed, Commerce even admitted in the Issues and Decision Memorandum accompanying the final results of this administrative review that it "has not established specific deadlines for when the Department will accept targeted dumping allegations in administrative reviews." J.A. 101. We conclude that Commerce's decision to reject the allegations as untimely because DSMC submitted the allega-

tions after Commerce released the preliminary results—despite DSMC having no notice of such a requirement—is not supported by substantial evidence and is not in accordance with law.

### 1. The *Final Modification*

The *Final Modification* did not indicate that Commerce was adopting a practice that parties were to submit targeted dumping allegations prior to the release of preliminary results. The *Final Modification* ended Commerce's historical default practice of using "zeroing" methodologies and instead made the average-to-average methodology the default methodology, while reserving to Commerce the right to use an alternative methodology on a case-by-case basis if the criteria of 19 U.S.C. § 1677f-1(d)(1) were met.

While considering the effective date of implementation for the changes laid out in the *Final Modification*, Commerce reviewed submissions from "[a] number of commentators" that supported a wide range of implementation deadlines. *Final Modification*, at 8110. Many proposed that Commerce should implement a 60-day delay because the new method might "confuse interested parties in several different ways" when applied to pending matters. *Id.* Others proposed that it would be unfair for Commerce to apply the new policy to any administrative reviews already under consideration. *Id.* Still others proposed shorter or longer time frames. *Id.*

After considering the comments, Commerce decided to apply the changes to all reviews in which the scheduled date for the preliminary results was at least 60 days after the publication date of the *Final Modification*. *Id.* at 8111. Commerce determined that this timing was appropriate so that parties could submit any new data and provide comment on the changes that it would render to the individual administrative review at issue. *Id.* Commerce's review of the effective date for implementation,

however, did not include any discussion regarding the timeline required for a party to request the application of a targeted dumping methodology.  Instead, the policy described the methodology that Commerce would apply in administrative reviews, and Commerce provided time for parties to consider the changes.

Commerce's decision in *Circular Welded Carbon Steel Pipes from Turkey* further refutes Appellees' argument that the *Final Modification* supports Commerce's reasoning in this case.  In the final results of that administrative review, Commerce stated, "when the Department recently announced that it would consider whether to use an alternative comparison method in administrative reviews on a case-by-case basis, the announcement contained no guidelines on the filing of a request to apply an alternative comparison method." *Circular Welded Carbon Steel Pipes from Turkey*, 77 Fed. Reg. at 72,820.  Contrary to assertions by the Appellees, the *Final Modification* did not establish, or even hint at, any requirement that parties submit targeted dumping allegations prior to the issuance of preliminary results.

### 2.  Commerce's Decisions in Previous Administrative Reviews

The two administrative review decisions identified by the parties did not establish a requirement by Commerce that parties submit targeted dumping allegations before the preliminary results.  In *Purified Carboxymethylcellulose From Finland*, Commerce stated that it "has not established a deadline for targeted dumping allegations in administrative reviews, and so it would be unreasonable to reject this allegation as 'untimely' where no such time limit was established."  77 Fed. Reg. at 47,038.  Although the petitioner in that administrative review filed targeted dumping allegations 45 days before the scheduled date for the preliminary results, Commerce clearly stated that it would have been unreasonable to reject the allegation as

untimely because Commerce "*ha[d] not established a deadline for targeted dumping allegations in administrative reviews.*" *Id.* (emphasis added). While Commerce also noted that the petitioner's submission of the targeted dumping allegations in *Purified Carboxymethylcellulose From Finland* would have met the "typical" investigation timeline for submitting targeted dumping allegations, it did not specify that timeline as a precondition to considering the allegation. *See id.*

Commerce's decision in *Circular Welded Carbon Steel Pipes from Turkey* is similar. When deciding that the targeted dumping allegations in that review were timely, Commerce provided this reasoning:

> Importantly, neither section 777A(d)(1)(B) of the Act nor the SAA provide any deadline as to when an interested party must file a targeted dumping allegation in either an investigation or an administrative review. Similarly, the Department's regulations do not provide for such a deadline in an investigation or an administrative review. Moreover, when the Department recently announced that it would consider whether to use an alternative comparison method in administrative reviews on a case-by-case basis, the announcement contained no guidelines on the filing of a request to apply an alternative comparison method. Further, the Department's current practice regarding the submission of a targeted dumping allegation in the initiation notice for an antidumping investigation is limited to antidumping investigations and not administrative reviews. Finally, by permitting Borusan to comment on the Post-Preliminary Analysis and to submit additional factual information in support of its comments, the Department has preserved Borusan's right to comment on the targeted dumping allega-

tion.    For these reasons, the Department finds that U.S. Steel's allegation was timely filed.

*Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review: Circular Welded Carbon Steel Pipes and Tubes from Turkey*, A-489-501, at cmt. 1 (footnotes omitted).

Commerce made no mention of a pre-preliminary results deadline for targeted dumping allegations.  Commerce instead noted that (1) there is no deadline provided by statute or regulation for administrative reviews; (2) even to the extent it employed a regular practice for targeted dumping requests, that practice was not employed in administrative reviews; and (3) there is no unfairness to allowing targeted dumping allegations where the opposing party has an opportunity to comment on the merits of those allegations.  The same reasoning applies here.

In addition to Commerce's express recognition that it had no established deadline for submitting targeted dumping allegations, the fact that it did consider targeted dumping allegations after the preliminary results in these other administrative reviews further undercuts the Appellees' argument that these reviews somehow put DSMC on notice that it was required to submit targeted dumping allegations before the preliminary results.  For example, in *Purified Carboxymethylcellulose From Finland*, Commerce stated that it had "not conducted a targeted dumping analysis" for the preliminary results.  77 Fed. Reg. at 47,038.  The government acknowledged in its brief that Commerce did not complete the targeted dumping analysis in that administrative review until after the release of the preliminary results.  U.S. Br. 27–28.  And in *Circular Welded Carbon Steel Pipes from Turkey*, Commerce explained that it provided a "Post-Preliminary Analysis" of the targeted dumping allegations.  77 Fed. Reg. at 72,820.  Commerce also "preserved" the parties' "right to comment

on the targeted dumping allegation" despite issuing its analysis after the preliminary results. *Id.*

Commerce's willingness to release its review of targeted dumping allegations after the preliminary results, and to allow for a separate comment period after that relating to the preliminary results, shows that Commerce could have done the same thing in this case, and that DSMC was not on notice that Commerce would refuse to do so. Indeed, Commerce even stated in *Purified Carboxymethylcellulose From Finland* that it would continue to consider "whether another method is appropriate in this administrative review in light of the parties' pre-preliminary comments and any comments on the issue that parties may include *in their case and rebuttal briefs*." 77 Fed. Reg. at 47,038 (emphasis added). Commerce's willingness to consider comments related to another methodology in the case briefs filed by the parties in *Purified Carboxymethylcellulose From Finland* while refusing to do so here indicates that Commerce's decision in this case is not in accordance either with its own practices or with law.

### 3. Commerce's Practice in Investigation Proceedings

Commerce's practice in investigations similarly did not establish a pre-preliminary results deadline for targeted dumping allegations that would apply to administrative reviews. As discussed above, the history of regulations in the investigation context shows that Commerce withdrew the regulations relating to a deadline for targeted dumping allegations in 2008 because it needed to conduct further analysis. *Targeted Dumping Regulation 2008*, 73 Fed. Reg. at 74,930–31. Commerce also explained that it was "not replacing these provisions with new provisions" but instead "returning to a case-by-case adjudication, until additional experience allows the Department to gain a greater understanding of the issue." *Id.*

As Appellees note, Commerce includes a deadline in initiation notices for initial investigations that requires parties to submit targeted dumping allegations 45 days prior to the issuance of the preliminary results. Commerce's failure to include a similar deadline for administrative reviews shows that Commerce treated administrative reviews differently. Indeed, Commerce even broke from the typical 45-day requirement in initial investigations when it accepted targeted dumping allegations filed about 15 days prior to the preliminary results date in *Circular Welded Carbon Steel Pipes from Turkey*. *See* 77 Fed. Reg. at 72,818. DSMC therefore had notice both that Commerce did not apply the same deadlines it used for investigations to administrative reviews, and that, even in initial investigations, those deadlines were not hard-and-fast rules. DSMC simply had no reason to believe that it needed to satisfy any timing requirements established by Commerce for investigations in this administrative review.

4. Remaining Arguments and Other Considerations

We find the remaining arguments set forth by Appellees similarly unpersuasive. Appellees acknowledge that Commerce extended the deadline for the final results in this case because of a need to address other methodology calculation issues, and they provide no reason why Commerce likewise could not have extended the deadline for the final results to consider the targeted dumping allegation while allowing time for comments. This argument seems particularly weak given that Commerce did not complete its antidumping analysis in *Purified Carboxymethylcellulose From Finland* until *after* the issuance of the preliminary results, thereby requiring Commerce to undertake some comment process after the preliminary results had been issued, just as it could have done in this case. *See* 77 Fed. Reg. at 47,038. Appellees' reliance on cases decided after this administrative review is equally unpersuasive. Commerce's actions after this case could

not have provided DSMC with notice of a deadline by which it would need to file a targeted dumping allegation here.

Because Commerce never established regulations or guidelines creating a deadline for filing targeted dumping allegations and because DSMC never had any other notice of a deadline for filing targeted dumping allegations, Commerce's rejection of DSMC's argument as untimely when it was raised as an argument in DSMC's case brief, as authorized by 19 C.F.R. § 351.309, is unsupported by law. We therefore vacate the CIT's decision affirming Commerce's decision regarding DSMC's targeted dumping allegations and remand for further consideration. We express no opinion on the merits of the targeted dumping allegation, particularly given that Weihai's merits arguments were not considered below.

C. Margin for Non-Selected Separate Rate Respondents

Commerce's calculation of the dumping margin for non-selected separate rate respondents in this second administrative review was based entirely on Weihai's final margin. *See Final Remand Redetermination*, slip op. 14-112, at 9–10. DSMC asserts that Commerce's failure to consider the targeted dumping allegation calls Weihai's dumping margin into question, thereby undermining the dumping margin of the non-selected separate rate respondents. DSMC requests that we vacate and remand this issue for further consideration consistent with any future analysis of the targeted dumping allegation. All parties agree that this issue depends entirely on our decision with respect to the targeted dumping allegation, and Appellees provide no separate argument for affirming the margin for the non-selected separate rate respondents. Because we vacate Commerce's decision regarding the timeliness of DSMC's targeted dumping allegation, we similarly vacate and remand this issue for further consid-

eration in light of any analysis performed with respect to DSMC's targeted dumping allegation against Weihai.

### D.  ATM's Receipt of the PRC-Wide Entity Rate

ATM challenges Commerce's application of the PRC-wide entity rate to ATM in the second administrative review and the CIT's decision affirming Commerce's order doing that.  ATM's arguments in this administrative review mirror its arguments from the first administrative review, which we have considered and decided in *Diamond Sawblades I*.  Because the substance of ATM's arguments on this issue do not extend beyond those considered in our opinion relating to the first administrative review, we affirm for the same reasons provided in that opinion.

## III.  CONCLUSION

For the foregoing reasons, we affirm in part, vacate in part, and remand for further consideration in light of this opinion.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED IN PART**

COSTS

No costs.